Electronically Filed
Intermediate Court of Appeals
30171
10-JUL-2012
02:44 PM

NO. 30171

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MELCHOR B. ADVIENTO, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 07-1-2068)


MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Leonard and Ginoza, JJ.)


Defendant-Appellant Melchor B. Adviento (Adviento) was charged with second-degree murder for stabbing his wife, Erlinda Adviento (Erlinda), to death. The prosecution gave notice that it intended to introduce evidence at trial of incidents of abuse, violence, and threats by Adviento against Erlinda, including a conviction for third-degree assault. The trial court indicated that it may permit the prosecution to introduce Adviento's assault conviction if Adviento raised the affirmative defense of extreme mental or emotional disturbance (EMED) and if such EMED defense arose from the nature of Adviento and Erlinda's relationship. The trial court, however, withheld ruling on the admissibility of the assault conviction because it was not sure how Adviento was going to raise the EMED defense.

Two days later, after consulting with Adviento, defense counsel placed on the record just before the commencement of trial that Adviento had decided not to assert an EMED defense. At trial, Adviento testified that he had killed Erlinda in self-

defense, after she had attacked him and stabbed him twice in the stomach and in the shoulder. After Adviento completed his testimony, the trial court engaged Adviento in a colloquy concerning his decision to waive his right to assert an EMED defense and to a jury instruction on the EMED defense. Adviento confirmed that he had decided to waive those rights and was relying on the defense of self-defense. The prosecution did not introduce Adviento's assault conviction at trial. The jury found Adviento guilty as charged of second-degree murder.

On appeal, Adviento contends that: (1) the trial court abused its discretion in ruling that Adviento's assault conviction would be admissible to rebut the defense of EMED; (2) his trial counsel provided ineffective assistance in advising Adviento to waive the defense of EMED; (3) the trial court plainly erred in permitting the prosecution to make arguments during closing argument that constituted misconduct, or, alternatively, trial counsel provided ineffective assistance by failing to object to the alleged improper arguments; and (4) trial counsel provided ineffective assistance by failing to adduce additional evidence to substantiate Adviento's claim of self-defense or to better establish Erlinda's alleged motive for being the first aggressor.[1] We affirm.

BACKGROUND

I.

A.

The prosecution adduced the following evidence at trial. Erlinda and Adviento were married and had three children: a 26-year-old son (Elder Son), an 18-year-old daughter (Daughter), and a 13-year-old son (Minor Son).[2] Adviento worked at a bakery as a baker's helper, while Erlinda was a registered

---

[1] The Honorable Richard K. Perkins presided over the proceedings relevant to this appeal.

[2] The referenced ages were the children's ages at the time of trial, which took place about twenty months after Erlinda's death.

nurse at a convalescent center. Erlinda, Adviento, Daughter, and Minor Son lived in a downstairs unit of a two-story, three-unit residence in Kalihi.

Erlinda had a close relationship with her co-worker Ricardo Dela Merced (Merced), whose wife and children were living in the Philippines. Erlinda and Merced spent a lot of time together and frequently spoke to each other on the phone. Merced testified that they had feelings for each other and would have been together if they had not already been married to others. On one occasion, Erlinda, Merced, Daughter, and Minor Son stayed overnight at a Waikīkī hotel.

Prior to Erlinda's death, Adviento took a three-week trip to the Philippines. When he returned, Adviento and Erlinda argued and accused each other of infidelity. Adviento, Erlinda, and Elder Son had a meeting, during which Erlinda told Adviento she wanted a divorce. Elder Son indicated that Erlinda's family in the Philippines had called Erlinda to report that Adviento had been "cheating" while on his trip to the Phillippines. Adviento responded "it's okay" to Erlinda's request for a divorce. Elder Son suggested that one of his parents move out of their residence because he was concerned they would fight and someone would get hurt. However, Adviento and Erlinda assured Elder Son that "nobody will get hurt" and the "we're going to be fine."

Daughter testified that the "subject of divorce" had been raised between Adviento and Erlinda, Adviento knew Erlinda wanted a divorce, and Daughter had seen divorce papers. Daughter was aware that Erlinda was spending a lot of time with Merced.

B.

On Sunday, the day of the fatal incident, Erlinda was at home sick, and Adviento and Daughter had gone to work. Erlinda gave Minor Son permission to go to the upstairs unit to play with his friends. When Minor Son left, Erlinda was watching television in her bedroom.

Erlinda was talking to Merced on the phone when their conversation was interrupted by someone banging on Erlinda's

bedroom door, who Erlinda said was her husband. Merced testified that he heard a "screaming mad" male voice tell Erlinda that she was asking about the male's relationship in the Philippines, but that she was the one with the "boyfriend." Then the phone call was disconnected.

From upstairs, Minor Son heard his mother scream and yell for him to "ah, ah, help me, . . . come downstairs, call 911." Minor Son did not hear his father scream. Upstairs neighbor, Myrna Villaver (Villaver), also heard a female's "long, unusual scream that that person needed help," which startled Villaver. Villaver and Minor Son ran downstairs, and Villaver instructed her children to stay back. Villaver told Minor Son to find out if his mother was okay. The front door to Minor Son's unit was closed and locked. Minor Son testified that he went to the window outside his mother's room and asked if "everything was okay." Minor Son said his mother did not respond, but he heard his father say "Everything's fine." Villaver testified that Minor Son asked, "[M]om, are you okay[?]" and a female voice said to call 911. Villaver called 911.

Honolulu Police Department (HPD) Officer Nalei Sooto (Officer Sooto) went to Adviento's residence in response to a 911 call. Officer Sooto repeatedly knocked on the door and announced "police" several times. After a few minutes, Adviento, covered in blood, opened the door. Officer Sooto asked Adviento what happened, and Adviento said, "I killed my wife." Officer Sooto handcuffed Adviento, who seemed dazed and fatigued, and called for an ambulance. As Officer Sooto walked with Adviento outside the house, Adviento said that "his wife was cheating, she tried to stab him. So he killed her, and then he tried to kill himself after." Officer Sooto noticed that Adviento was bleeding from an injury to his collarbone area and that his wrists were slit and bleeding.

HPD officers found Erlinda on the bedroom floor in between the bed and dresser. She was covered in blood, had sustained cuts, and did not have a pulse. Two knives and a bent

curtain rod were found on the bedroom floor next to Erlinda.
Dr. Kanthi De Alwis (Dr. De Alwis), the Chief Medical Examiner
for the City and County of Honolulu, performed an autopsy on
Erlinda.  Dr. De Alwis testified that Erlinda sustained sixteen
stab wounds and a cut to the face.  Several of the stab wounds
penetrated Erlinda's lungs and heart and were fatal.  Erlinda
also had several cuts to the palm side of her hands, the back of
her hands, and her elbows, which Dr. De Alwis considered to be
"defensive wounds."  Dr. De Alwis explained that defensive wounds
are caused when someone tries to grab or ward off a knife.  Dr.
De Alwis opined that the cause of death was "bleeding from the
injuries to the heart and lung as a result of the stab wounds in
the chest."

Adviento was transported from the scene to the Queen's
Medical Center emergency room.  Dr. Hao Chih Ho (Dr. Ho), the
trauma surgeon who treated Adviento, testified that Adviento had
three open wounds to the front of his abdomen, an open wound to
the right base of his neck, two open wounds to the left base of
his neck, multiple lacerations to both wrists, a collapsed right
lung with bleeding into the right chest, six perforations of his
intestines, and an injury to his spleen.  The three stab wounds
to Adviento's abdomen would have caused a "great deal of pain."
Dr. Ho operated on Adviento and repaired the injury to Adviento's
bowels, removed his spleen, reinflated his right lung, and
repaired his wounds.  Adviento did not have any cuts or open
wounds on his hands and did not receive any treatment for his
hands.

II.

Adviento testified in his own defense at trial.
According the Adviento, he and Erlinda had been having marital
problems for about a year because Adviento suspected Erlinda
might be "fooling around."  Erlinda said she was working
overtime, but when Adviento went to her workplace, she was not
there and her co-workers said she went home.  While recuperating
from foot surgery due to a work injury, Adviento went to the

5

Philippines for three weeks and stayed with Erlinda's siblings. When he returned to Hawaiʻi, Erlinda said her sister had called and reported that Adviento was "having an affair and womanizing in the Phillippines[.]" Erlinda told Adviento that she wanted a divorce. They discussed Erlinda's request for a divorce with Elder Son two or three weeks before the fatal incident. Before that discussion, Erlinda had already told Adviento she wanted a divorce two or three times.

Adviento stated that on the day of the incident, he went to work at 5:00 a.m. He returned home about noon, did chores, cooked, and took a nap. He did not realize that Erlinda was home. After getting up and taking a shower, he went toward Erlinda's bedroom to get a shirt. As he was entering the bedroom, he heard Erlinda say, "Sweetheart, will it be okay if I don't have any present to you?" Adviento felt "[f]rustrated" upon hearing this. He knocked on the bedroom door, went inside, and saw Erlinda taking on her cell phone. Adviento told Erlinda that although she was accusing him of having a "relationship" in the Philippines, she was the one "having a boyfriend over here." Erlinda threw the cell phone at Adviento. They argued and Adviento said he was going to call Erlinda's workplace to verify her overtime "that never show on her pay stub, and the five days and five nights that she never come home[.]"

Adviento testified that as he picked up a phone and started to dial, he felt a pain in his stomach. He looked down and saw blood, and was surprised to see Erlinda with a knife in her hand. Adviento felt another stab to his stomach and pain. Adviento hit Erlinda with the phone, pushed her face, and then took her knife away from her. Adviento felt "another pain" to his shoulder, and he "was afraid [for his] life" and "thought [he] was going to die" because there was "plenty blood." Adviento stated that he then "just stab her, I don't know how many times. I don't know where, which part of her body I stab. I just kind of afraid that I would die." Adviento felt pain to his shoulder again and grabbed Erlinda's right arm. Adviento

stabbed, and Erlinda fell on him.  They struggled for a while and then Erlinda stopped moving.

Adviento testified that he stood up, did not know if Erlinda was unconscious or dead, and was shocked and confused. Adviento locked the front and back doors.  Adviento went back to the bedroom and grabbed the knife from Erlinda's hand.  Adviento cut his wrists because his wife tried to kill him, he wanted to die, and "[he] would rather be dead than her."

Eventually the police arrived.  Adviento was feeling dizzy.  Adviento recalled telling the police, "My wife is cheating on me.  She stabbed me.  She tried to kill me.  I killed her."  According to Adviento, Erlinda had two knives in her hands when she attacked him.  He did not know how the knives got into the bedroom, but noted that knives could be found outside the kitchen because sometimes Erlinda used them to sharpen her eyeliner and his son used them to sharpen pencils.  Adviento denied stabbing Erlinda first.  Adviento acknowledged that Erlinda had screamed and that he did not scream or call for help. Adviento did not try to get help for Erlinda after she stopped moving.

### III.

The jury found Adviento guilty as charged.  The Circuit Court of the First Circuit (Circuit Court) sentenced Adviento to a term of life imprisonment with the possibility of parole.  The Circuit Court filed its Judgment on October 21, 2009, and this appealed followed.

### DISCUSSION

### I.

Adviento contends that the Circuit Court abused its discretion "when it ruled" that Adviento's prior conviction for third-degree assault, which was committed against his wife, "would be admissible to rebut [an] EMED defense."  Adviento argues that the Circuit Court's "erroneous ruling caused Adviento to forego the EMED defense" and did not constitute harmless error because "there was more than a reasonable possibility that the

lack of the EMED instruction contributed to Adviento's conviction for second-degree murder . . . ."

Plaintiff-Appellee State of Hawai'i (State) counters that the Circuit Court did not rule that Adviento's prior assault conviction was admissible, but instead took the matter under advisement until the evidence necessary to determine the admissibility of the conviction was presented. The State argues that because Adviento decided not to pursue an EMED defense, the Circuit Court never issued a ruling on the admissibility of the assault conviction, and therefore, there is no ruling admitting evidence for this court to review. The State also asserts that the record does not support the conclusion that the Circuit Court's decision to reserve ruling on the admissibility of the assault conviction caused Adviento to forego an EMED defense.

As explained below, we conclude that Adviento is not entitled to any relief based on the manner in which the Circuit Court handled the issue of the admissibility of his prior assault conviction.

A.

The parties dispute the proper characterization of what the Circuit Court decided pre-trial with respect to the admissibility of Adviento's prior assault conviction. We begin with a discussion of facts relevant to that issue.

1.

The State filed a notice of its intent to use evidence at trial of incidents of abuse, violence, and threats by Adviento. The State identified numerous incidents, including (1) Adviento hitting Erlinda on the head with a phone, causing injuries, which resulted in his conviction for third-degree assault; (2) observations of Erlinda with bruises to her arms and face and bleeding allegedly attributable to abuse by Adviento; (3) a conviction for reckless endangering based on Adviento's firing a semi-automatic pistol into the ground and other alleged observations of Adviento shooting a handgun outside his residence; and (4) alleged threats by Adviento to hurt or kill

8

Erlinda or members of her family after Adviento returned from a trip to the Philippines. The State filed a separate motion in limine to permit the introduction of the alleged threats by Adviento, upon his return from the Philippines, to hurt or kill Erlinda or her family if she divorced him. Adviento filed a motion in limine to preclude evidence of the incidents of abuse, violence, and threats identified by the State.

Prior to trial, the Circuit Court held a hearing on the parties' motions in limine. The Circuit Court first ruled that the gun-related incidents would be excluded. It also ruled that the evidence of Adviento's threats against Erlinda or her family if she divorced him would be admitted if based on personal knowledge, because it "goes to the defendant's motive and also possibly to rebut EMED." The Circuit Court then stated it was "going to withhold ruling on the other material." The Circuit Court noted that it would probably exclude the evidence related to the observation of bruises on Erlinda because the bruises might or might not have been caused by Adviento.

The Circuit Court then turned to a discussion of the incident in which Adviento hit Erlinda with a phone that resulted in his conviction for third-degree assault. The Circuit Court expressed confusion over whether there was a second incident, different from the assault conviction, in which Adviento had allegedly hit Erlinda with a phone. However, counsel for Adviento and the State both advised the Circuit Court of their belief that there was only one phone-assault incident. Adviento's counsel argued that Minor Son was the only remaining witness to this incident, but that Minor Son had indicated difficulty in remembering or that he wanted to forget the incident. Adviento's counsel indicated that different issues were raised by proof of the incident through witness observations or through the conviction. In response, the Circuit Court stated:

The COURT: . . . Okay. If it's the same thing, [3/] my preference would be to allow in the conviction; because we don't have to fight about what really happened. There was a conviction. And this is why I'm withholding ruling on it. Because I'm not sure how you're going to raise the EMED defense. I can't, at this point, get it clear in my mind how it's going to come up. I mean, if it depends on the relationship, then *Maelega* and cases like *Hiley* (phonetic) [4/] say it comes in.

Right?

If his defense arises from the nature of their relationship, it may have to come in. If it doesn't, then it won't. I think that -- I'm not convinced that -- let's put it that way. I'm not convinced that it would come in for anything other than rebuttal of the EMED defense. We're talking about that conviction, the hitting on the head with the phone.

[DEFENSE COUNSEL]: I just need to be clear. . . .

If we're talking about that, is it just going to be the conviction? Or is it going to be the facts underlying the conviction, as well?

THE COURT: Just the conviction.

. . . .

THE COURT: As far as the strength of the evidence goes, the conviction is the strongest evidence. And if you are -- if you are trying to establish in rebuttal of the EMED defense that this marriage was not without its problems and there was some violence in the past, to me the conviction is your evidence, if the Defense raises that defense. And, so, what I'm saying is, if that comes in, it will come in on rebuttal, the conviction. And let's -- let me rule now, that if it comes in, it will just be the conviction of Assault in the Third Degree, assault against the decedent and not the specific facts. Let's just wait on that.

. . . .

[PROSECUTOR]: Okay. As far as my opening statement, then --

THE COURT: Don't mention the conviction.

[PROSECUTOR]: Okay.

---

3/ The Circuit Court was apparently referring to the parties' advisement that there was only one incident involving Adviento assaulting Erlinda with a phone, and not a second incident separate from the assault conviction.

4/ The Circuit Court was apparently referring to State v. Maelega, 80 Hawaiʻi 172, 907 P.2d 758 (1995), and State v. Haili, 103 Hawaiʻi 89, 79 P.3d 1263 (2003).

THE COURT: <u>Because, again, I'm not sure how the EMED defense will arise. I don't know what he's going to say</u>.

[PROSECUTOR]: <u>Okay</u>.

THE COURT: <u>Do you know</u>?

[PROSECUTOR]: <u>No</u>.

THE COURT: <u>It's got to be probative, okay, because it is prejudicial. It's not just that he did the act. But if a conviction comes in, it tends to indicate character. That's what we're worried about, that the jury will misuse the character evidence. So that's why we're going to wait until I hear exactly how EMED comes up, if it comes up.</u> Or if it doesn't come up, then we've got more problems. But the motive stuff would come in, anyway, even if EMED wasn't raised, in my view.

. . . .

THE COURT: So are we clear on this?

Opening statement should not address anything other than the motive evidence, the threat, you know, upon coming back from the Philippines. If you're going to -- if you're going to bring that in, then you can mention it in your opening statement, but none of the other -- not the conviction.

(Emphases added).[5/]

2.

Two days later, just prior to opening statements, defense counsel informed the Circuit Court that Adviento had decided to waive any EMED defense:

[DEFENSE COUNSEL]: . . . I want to put on the record yesterday I met with Mr. Adviento, we discussed the Court's pretrial rulings, defenses and the type of evidence and things of that nature, and based on his decision, we are not going to be asserting the . . . extreme emotional disturbance defense, and this is his decision that he made yesterday, so I just wanted to put that on the record.

3.

After Adviento finished testifying in his own defense, the Circuit Court engaged Adviento a colloquy to confirm his decision to waive reliance on an EMED defense:

_____

[5/] At trial, Elder Son testified that Adviento had made threats against Erlinda's family members in the Philippines, who had accused Adviento of infidelity while Adviento was in the Philippines. The Circuit Court, however, later struck this testimony because of the lack of evidence that these threats were related to Erlinda's request to divorce Adviento, and it instructed the jury to disregard this testimony.

THE COURT: Earlier in this trial, [Defense counsel] told me that you were not going to assert the defense of extreme mental or emotional disturbance.

Do you remember that?

[ADVIENTO]: Yes, sir.

THE COURT: Have you discussed the defense of extreme mental or emotional disturbance with [Defense counsel]?

[ADVIENTO]: Yes, sir.

THE COURT: Let me just tell you that I would, if requested, instruct the jury on extreme mental or emotional disturbance in this case.

Extreme mental or emotional disturbance is a defense, it's an affirmative defense, that reduces the crime of murder to manslaughter. Murder carries a maximum penalty of life in prison with a possibility of parole. Manslaughter carries a maximum penalty of 20 years.

Do you understand that?

[ADVIENTO]: Yes, sir.

THE COURT: So do you understand that if I don't give an instruction on extreme mental or emotional disturbance, the jury will not be able to consider it, and you will be giving up the opportunity to be convicted of the lesser offense of manslaughter?

[ADVIENTO]: Yes, sir.

THE COURT: Do you have any questions at all about this?

[ADVIENTO]: No.

THE COURT: Do you give up your right to assert the defense of extreme mental or emotional disturbance?

[ADVIENTO]: Yes, sir.

At this point in the colloquy, the prosecutor suggested that Adviento be given additional time to consider his decision and to consult with his lawyer. The Circuit Court called a recess to give Adviento additional time to think about his decision. The Circuit Court advised Adviento that he could change his mind if that is what he wanted to do.

Upon reconvening after a short recess, Adviento reconfirmed his decision to waive reliance on an EMED defense.

[DEFENSE COUNSEL]: And, Judge, before you continue, I just want to put on the record, too, that we did discuss

12

this quite extensively prior to. He just had a few clarification questions.

THE COURT: Okay. Well, Mr. Adviento, you've had ten minutes or so to talk to [Defense counsel]. Was that sufficient time for you to --

[ADVIENTO]: Yes.

THE COURT: -- get all the questions that you wanted answered?

[ADVIENTO]: Yes, Your Honor.

THE COURT: Do you have any questions you want to ask me?

[ADVIENTO]: No, Your Honor.

THE COURT: Have you made your decision about whether or not to assert the defense of --

[ADVIENTO]: Yes, sir, Your Honor.

THE COURT: -- extreme mental or emotional disturbance?

[ADVIENTO]: Yes, Your Honor.

THE COURT: And what is your decision?

. . . .

[ADVIENTO]: We will go for the self-defense.

THE COURT: All right. But you will not raise the defense of extreme mental or emotional disturbance?

[ADVIENTO]: Yes, Your Honor.

THE COURT: All right. Then the Court will find that the Defendant having been fully informed has knowingly, intelligently and voluntarily waived any jury instruction on extreme mental or emotional disturbance.

So that the Court's ruling as to the other incidents, violence perhaps in relationship will not be allowed.

### B.

Based on our review of the record, we conclude that the Circuit Court did not rule that Adviento's prior assault conviction would be admissible to rebut an EMED defense. Instead, the Circuit Court withheld its ruling on the admissibility of the assault conviction until it understood the nature and substance of any EMED defense that Adviento intended

13

to raise.[6/]  The Circuit Court indicated that only then would it be able to determine whether the prior conviction was relevant and balance its probative value against the risk of prejudice. When the Circuit Court withheld its ruling, Adviento had not even asserted that he intended to raise an EMED defense, much less proffered the details of any such defense.  The Circuit Court stated, "I'm not sure how you're going to raise the EMED defense. I can't, at this point, get it clear in my mind how it's going to come up."

Because the nature and substance of Adviento's possible EMED defense was unclear and speculative, the Circuit Court declined to rule on the admissibility of Adviento's prior assault conviction.  The Circuit Court simply advised the parties that if it later determined that the conviction was admissible, it would limit the evidence to the third-degree assault conviction and would not permit witnesses to testify about the specific facts on which the conviction was based.  Adviento's subsequent decision to waive any EMED defense made it unnecessary for the Circuit Court to rule on the admissibility of the assault conviction, and evidence of this conviction was not presented at trial.

Accordingly, the posture of this appeal is that Adviento is seeking to vacate his conviction based on a trial court's decision to withhold ruling on the admissibility of evidence (which was never actually admitted at trial) pending the receipt of additional information or evidence the court felt was necessary to make an informed decision.

C.

In <u>Luce v. United States</u>, 469 U.S. 38, 40-43 (1984), the United States Supreme Court held that a defendant must testify in order to preserve his or her right to appeal a trial court's in limine ruling that a prior conviction was admissible

---

[6/] The only definite ruling made by the Circuit Court was that *if* it decided to permit evidence of the prior assault to rebut an EMED defense, only the third-degree assault conviction, and not the specific underlying facts, would be permitted.

for impeachment purposes. In support of its decision, the Court reasoned:

> A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context. This is particularly true under [Federal Rules of Evidence] Rule 609(a)(1), which directs the court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify.
>
> Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling. On a record such as here, it would be a matter of conjecture whether the District Court would have allowed the Government to attack petitioner's credibility at trial by means of the prior conviction.

Id. at 41-42 (footnotes omitted).

In applying Luce, some courts have distinguished between in limine evidentiary rulings where the determinative issue was legal rather than factual, and thus the reviewing court's concerns about ruling in a factual vacuum were not present. See United States ex rel. Adkins v. Greer, 791 F.2d 590, 594 (7th Cir. 1986); see also Luce, 469 U.S. at 44 (Brennan, J., concurring) (stating that where "the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate"). Courts have held that Luce is inapplicable, and the trial court's ruling is reviewable, where the trial court's decision turned on a legal question. See Adkins, 791 F.2d at 594; People v. Brown, 49 Cal. Rptr. 2d 652, 656-59 (Cal. Ct. App. 1996).

In State v. Schnabel, No. SCWC-29390, 2012 WL 1981217 (Hawaiʻi May 11, 2012), the Hawaiʻi Supreme Court addressed the reviewability of a trial court's in limine decision regarding whether testimony from Schnabel's prior juvenile proceeding would

15

be admissible to impeach Schnabel's testimony that he did not know a single punch could cause the death of a person. Schnabel ultimately did not testify at trial. The supreme court held that the admission of testimony from a juvenile proceeding was statutorily prohibited and that the trial court's erroneous in limine decision harmfully infringed on Schnabel's right to testify. Schnabel, slip op. at 25-43, 2012 WL 1981217, at *10-15.

In support of its decision, the supreme court noted that Luce has been subject to criticism, and it also distinguished Luce from Schnabel's case.

> "Luce has been subjected to little but steady and unrelenting criticism[.]" James Joseph Duane, Appellate Review of In Limine Rulings, 182 F.R.D. 666 (1999). One criticism of Luce, out of many, is that it "forces upon an accused what is arguably an unfair choice; testify under circumstances where it is virtually certain the prosecutor will regale the jury with tales of prior convictions, or refrain from testifying, deprive the jury of the accused's side of the story, and lose all chance to appeal." 28 Charles Alan Wright, et al., Federal Practice and Procedure: Evidence § 6119 at 123 n.49 (1st ed. 1993). Since Luce, the Supreme Court has formally settled into the position that a defendant has a right to testify in his own behalf, Rock v. Arkansas, 483 U.S. 44, 49-51, 107 S. Ct. 2704, 97 L. Ed.2d 37 (1987), and "[i]n a host of other contexts, . . . has held that a constitutional right may be violated, even where the accused is not strictly forbidden from exercising that right, *as long as some trial ruling undermines the right by improperly and unfairly making its exercise costly[,]*" Duane, Appellate Review of In Limine Rulings, 182 F.R.D. 666 (emphasis added) (internal quotation marks omitted). Indeed, requiring the defendant to testify in order to preserve the issue for appeal is wrong, since it fails to recognize "the significance that such impeachment has on the defendant's decision concerning the testimony." Paul F. Rothstein, Federal Rules of Evidence: A Fresh Review and Evaluation, 120 F.R.D. 299, 363 (1987).

>> States declining to adopt Luce have reasoned that

>> the problem of meaningful review is unfounded when the *record sufficiently demonstrates, through an offer of proof, the nature of the defendant's proposed testimony and that the defendant refrained from testifying when faced with impeachment by a prior conviction.* Under such conditions, a reviewing court would have a sufficient record to conduct a harmless error analysis.

> Warren v. State, 121 Nev. 886, 124 P.3d 522, 527 (Nev. 2005) (emphases added). In the instant case, it would be unwise to "apply" a rule that, in effect compelled Petitioner to

> make an "unfair choice" of either testifying under circumstances where it was "virtually certain" the prosecutor would "regale the jury" with Dr. Camara's testimony [from Schnabel's juvenile proceeding], or remain silent and "deprive the jury" of his testimony and "lose all chance of appeal." 28 Charles Alan Wright, et al., supra, § 6119 at 123 n.49. Of course, as noted previously, HRS § 571-84 bars the admission of evidence from a juvenile proceeding in the instant case, precluding any effort to "regale the jury" with Dr. Camara's testimony, further underscoring the inapplicability of Luce's rationale to this case.

Id., slip op. at 73-74, 2012 WL 1981217, at *24 (emphases and some brackets in original).

The majority and dissenting opinions in Schnabel disagreed over the certainty with which the trial court had ruled on the admissibility of the testimony from Schnabel's juvenile proceeding. The majority described the trial court as ruling that "it would allow the cross-examination [of Schnabel with the testimony from the juvenile proceeding] and [as having] later reconfirmed its ruling after the prosecution had rested its case." Id., slip op. at 72, 2012 WL 1981217, at *23. The dissent, on the other hand, stated that the trial court "noted the need 'to take this under advisement and read over [sic] again[,]' but indicated its 'inclination . . . to give [the State] some latitude' if Schnabel responded in the negative to the question whether he knew that one punch could kill." Id., slip op. at 8, 2012 WL 1981217, at *31 (Recktenwald, C.J., dissenting) (brackets and "[sic]" in original).

Adviento's case is somewhat different than Schnabel because unlike Schnabel, the predicate evidentiary issue does not turn on a question of law and the nature of the defendant's likely testimony is not well defined. In any event, we need not decide whether these factors or whether any differences in the degree of certainty with which the trial court expressed its ruling on the admissibility of the challenged evidence affects the reviewability of the trial court's in limine decision. Assuming that we may review the Circuit Court's decision in this

17

case, we conclude that the Circuit Court did not err in rendering its decision.

D.

EMED is an affirmative defense which, if satisfied, reduces the offense of second-degree murder to manslaughter. HRS § 707-702(2) (Supp. 2011) provides:

> (2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.

Because EMED is an affirmative defense, the defendant has the burden of proving the defense by a preponderance of the evidence. HRS § 701-115(2)(a) (1993).

The Circuit Court considered the admissibility of Adviento's prior assault conviction under Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2011), which provides in relevant part:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Under HRE Rule 404(b), "other bad act" evidence is admissible when: 1) it is relevant to any fact of consequence other than the defendant's propensity to commit the crime charged; and 2) its probative value is not substantially outweighed by the danger of unfair prejudice. State v. Renon, 73 Haw. 23, 31-32, 828 P.2d 1266, 1270 (1992). A trial court's determination that evidence is relevant turns on the application

18

of HRE Rule 401 (1993)[7] and is reviewed under the right/wrong standard. State v. Cordeiro, 99 Hawaiʻi 390, 404, 56 P.3d 692, 706 (2002). The trial court's decision in balancing probative value against unfair prejudice involves the application of HRE Rule 403 (1993)[8] and is reviewed for abuse of discretion. Cordeiro, 99 Hawai"i at 404, 56 P.3d at 706. A trial court does not abuse its discretion unless it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (internal quotation marks and brackets omitted).

### E.

We conclude that the Circuit Court did not err in its decision to withhold its ruling on the admissibility of Adviento's prior assault conviction until the nature and substance of Adviento's possible EMED defense became clearer. The Hawaiʻi Supreme Court has concluded that prior bad acts involving domestic violence committed against the alleged victim may be admissible to rebut a defendant's EMED defense, where the EMED defense is based on the defendant's relationship with the alleged victim. See State v. Maelega, 80 Hawaiʻi 172, 183-84, 907 P.2d 758, 769-70 (1995); cf. State v. Haili, 103 Hawaiʻi 89, 106, 79 P.3d 1263, 1280 (2003) (indicating that evidence that the defendant had previously abused and threatened his wife supported

---

[7] HRE Rule 401 provides:

**Definition of "relevant evidence".** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[8] HRE Rule 403 (1993) provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the conclusion that the defendant was not under the influence of EMED at the time he shot and killed her).[9/] Depending upon the nature and substance of Adviento's possible EMED defense, evidence of Adviento's prior conviction for assaulting his wife may have been relevant to illuminate and explain Adviento's relationship with his wife and to rebut an asserted EMED defense. Thus, it was important for the Circuit Court to understand the nature and substance of Adviento's possible EMED defense in order to rule on whether Adviento's prior conviction would be admissible to rebut such a defense. However, Adviento did not proffer or provide details of the possible EMED defense he might raise. Under these circumstances, we cannot say that the Circuit Court erred in declining to decide whether it would permit Adviento's prior assault conviction to be admitted until Adviento provided details of the nature and substance of the EMED defense he intended to raise.

Adviento's own testimony at trial refutes any substantial EMED defense arising out of Erlinda's alleged infidelity. Adviento admitted that for about a year, he had suspected that Erlinda was "fooling around" and that Erlinda had repeatedly requested a divorce -- with Erlinda's last request being made several weeks before the fatal stabbing. Adviento testified that prior to entering Erlinda's bedroom, he heard her speaking on the telephone and referring to the other person as "sweetheart." However, overhearing this conversation did not prompt Adviento to attack Erlinda. Rather, Adviento testified that it was Erlinda who attacked him first by stabbing him in the stomach and that he responded by stabbing her in self-defense to save his own life. Adviento's testimony refuted any claim that

---

[9/] Courts from other jurisdictions have held that evidence of prior domestic abuse committed by the defendant against the alleged murder victim was admissible to illuminate the relationship between the defendant and the alleged victim; to portray the history surrounding their relationship and place the charged incident and the defendant's behavior in proper context; and to show the defendant's motive and intent. See State v. Bauer, 598 N.W.2d 352, 364-65 (Minn. 1999); State v. Yoh, 910 A.2d 853, 863-64 (Vt. 2006); State v. Jones, 955 A.2d 1190, 1195-97 (Vt. 2008).

he killed Erlinda "under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation" due to his discovery of her alleged infidelity.

Adviento testified that Erlinda stabbed him twice in the stomach, which took him by surprise, and that once he realized she was trying to kill him, he kept stabbing her until she stopped moving because he was afraid he was going to die. Adviento stated that when he got up after Erlinda stopped moving, he was shocked and confused.

Based on this testimony, Adviento contends on appeal that he had a viable EMED defense because he was shocked by his wife's attempt to kill him when he was confronting her about "her lies and her affair[.]" However, if Adviento sought to raise an EMED defense on this theory, we conclude it is clear from the record that the Circuit Court would have precluded the State from introducing Adviento's prior assault conviction. In its pre-trial discussion of the assault conviction, the Circuit Court plainly stated it would only consider admitting the assault conviction if Adviento asserted an EMED defense that was based on the nature of his relationship with his wife. The Circuit Court stated, "If his [EMED] defense arises from the nature of their relationship, it may have to come in. If it doesn't, then it won't." Adviento's trial testimony demonstrated that his purported EMED defense arose out of his shock at being stabbed and his fear of dying and that it was not based on the nature of his relationship with his wife. We conclude that the Circuit Court would not have permitted the admission of the assault conviction to rebut such an EMED defense.

II.

Adviento contends that his trial counsel provided ineffective assistance in advising Adviento to waive the defense of EMED. We review claims of ineffective assistance of counsel to determine whether, "viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases." Dan v. State, 76 Hawai'i 423, 427, 879 P.2d

21

528, 532 (1994) (internal quotation marks, citation, and brackets omitted).

> [T]he defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

State v. Richie, 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998). We conclude that Adviento has failed to meet his burden of showing that his trial counsel provided ineffective assistance.

Adviento was charged with second-degree murder, a charge which carried a penalty of life imprisonment with the possibility of parole. See HRS § 707-701.5 (1993); HRS § 706-656 (1993 & Supp. 2011). Self-defense is a complete defense that, if accepted by the jury, entitles a defendant to a verdict of not guilty. The affirmative defense of EMED, on the other hand, is not a complete defense but only a mitigating defense. Even if successful, the EMED defense results in the defendant being convicted of a class A felony and subject to imprisonment for twenty years. See HRS § 707-702(2) and (3) (Supp. 2011).

The record reflects that Adviento made the decision to waive reliance on an EMED defense; it does not show what advice Adviento's trial counsel gave Adviento regarding this decision or whether trial counsel even advised Adviento to forego asserting an EMED defense. Based on the record and under the circumstances of this case, we cannot say that it would have been unreasonable for competent defense counsel to advise Adviento to forego asserting a possible EMED defense and instead to rely solely on a claim of self-defense. There was substantial evidence to support a claim of self-defense, including evidence that Adviento sustained serious, painful stab wounds to his abdomen; that he suffered a collapsed right lung, six perforations of his intestines, and an injury to his spleen; and that he required emergency surgery. Adviento's trial counsel could have rationally concluded that a claim of EMED would have detracted

22

from or conflicted with a claim of self-defense and that Adviento would be better off relying soley on a claim of self-defense.

Although we conclude that Adviento has failed to meet his burden of proving ineffective assistance of counsel in this appeal, the record, as noted, does not reflect the particular advice trial counsel gave to Adviento or the reasons for counsel's advice. Adviento's trial counsel apparently withdrew from representing Adviento after sentencing and thus Adviento may not have had a fair opportunity to develop the record to support his ineffective assistance of counsel claim. We therefore do not preclude Adviento from raising a claim of ineffective assistance of counsel with respect to the advice he received on asserting an EMED defense, in a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 proceeding based on a more fully developed record.

### III.

### A.

We reject Adviento's claim that the Circuit Court plainly erred in permitting the prosecution to make improper arguments during closing argument.

"Prosecutorial misconduct warrants . . . the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996).

> [A] prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. State v. Apilando, 79 Hawai'i 128, 141-42, 900 P.2d 135, 148 (1995) (citing State v. Zamora, 247 Kan. 684, 803 P.2d 568 (1990) (other citations omitted)). It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. See, e.g., State v. Abeyta, 1995 NMSC 52, 120 N.M. 233, 901 P.2d 164, 177-78 (1995) ("Where the evidence presents two conflicting versions of the same events, 'a party may reasonably infer, and thus, argue, that the other side is lying.'" (Citation omitted.)); Ex parte Waldrop, 459 So. 2d 959, 961 (Ala. 1984) ("During closing argument, the prosecutor as well as defense counsel has a right to present his [or her] impressions from the evidence, if reasonable and may argue every legitimate inference."); People v. Sutton, 260 Ill. App. 3d 949, 197 Ill. Dec. 867, 876, 631 N.E.2d 1326, 1335

> (1994) ("The prosecution may base its closing argument on the evidence presented or reasonable inference therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight the inconsistencies in defendant's argument.").

Clark, 83 Hawaiʻi at 304-05, 926 P.2d at 209-10 (citation format changed, some brackets in original).

Adviento identifies three alleged instances of prosecutorial misconduct during closing argument: 1) the prosecutor's "curtain rod" argument; 2) the prosecutor's opening remarks referring to Erlinda as someone who could have been a juror if Adviento had not killed her; and 3) the prosecutor use of the term "killing" rather than "force" or "deadly force" in discussing Adviento's claim of self-defense. Adviento did not object at trial to any of these remarks made by the prosecutor. We address each of Adviento's arguments separately.

1.    The "Curtain Rod" Argument

During closing argument, the State argued that a bent curtain rod found next to Erlinda's dead body served to contradict Adviento's claim of self-defense. The prosecutor argued:

> There were some other things in the room. There was this metal curtain rod.
>
> This was found underneath Mrs. Adviento's body. And ladies and gentlemen, this metal curtain rod doesn't lie. It cannot lie. It has clearly been bent. It's missing, according to the photos, from the window. And you know what, this is what I was waiting for the Defendant to say when he testified, I was waiting for him to say he grabbed the metal curtain rod.
>
> In other words, when he was stabbed, she came after him like a banshee with two knives, and he reached up, grabbed the metal curtain rod, blocked her move and then flipped her hand in midair, which caused the knife to fly out, he caught it and then was able to be in the game after that.
>
> But you know what, he never talked about that. He never talked about this metal curtain rod, and that's a problem for him.
>
> Because if he did not have the metal curtain rod, then she must have had the metal curtain rod.

> And if she's holding this, then her hands are occupied, which means her hands are no longer attacking him with two knives.

Adviento contends that this argument was improper because it was not based on the evidence presented. We disagree. The State presented testimony as well as photographs showing that a bent curtain rod, which appeared to have come from above a window in Erlinda's bedroom, was found on the floor by the police next to Erlinda's body. The prosecutor did not exceed his wide latitude to discuss and comment on the evidence by suggesting a scenario in which Erlinda grabbed the curtain rod to protect herself and thus could not have been attacking Adviento with two knives as Adviento claimed. In addition, contrary to Adviento's argument, the prosecutor did not make himself a witness by stating that he was waiting for Adviento to explain the curtain rod. Nor was it improper for the prosecutor to draw an adverse inference from Adviento's failure to account for the curtain rod, which clearly appeared to be out of place next to Erlinda's body.

2.    Remarks Regarding Erlinda Being a Juror

Adviento argues that the prosecutor engaged in an improper emotional appeal to the jury through the following remarks made at the outset of his closing argument.

> Erlinda Adviento, mother of three, grandmother of four, registered nurse, CNA Instructor. Really nice. Wouldn't hurt others.
>
> If this were two years earlier, she could have been sitting right next to you in the jury pool, worrying about being chosen, feeling uncomfortable, wondering how long it was going to be, making small talk, sharing pictures of her beautiful grandchildren with the people next to her.

The reference to Erlinda's family status, occupation, personality, and peaceful character were all based on testimony presented by witnesses at trial and were clearly permissible. We need not decide whether the prosecutor's remarks referring to Erlinda as someone who could have been a juror were improper because we conclude that any error concerning such remarks did not affect Adviento's substantial rights. See State v. Iuli, 101 Hawai'i 196, 208, 65 P.3d 143, 155 (2003) (stating that where

25

there is no objection to the prosecutor's alleged misconduct, the appellate court must, "as a threshold matter, determine whether the alleged misconduct constituted plain error that affected [the defendant's] substantial rights"). The jury was fully aware that Erlinda had been killed and was no longer alive; the evidence against Adviento was strong; and the Circuit Court had instructed the jury that in deciding the case, the jury "must not be influenced by pity for the Defendant or passion or prejudice against the Defendant." Under these circumstances, any error in the prosecutor's remarks did not rise to the level of plain error and did not prejudice Adviento's right to a fair trial.

3. Use of the Term "Killing"

Adviento argues that the prosecutor's use of the word "killing" instead of "force" or "deadly force" during his discussion of Adviento's claim of self-defense was improper and constituted a misstatement of the law. Adviento's argument is without merit.

There was no dispute that Adviento had killed Erlinda. The dispute was over whether Adviento's killing of Erlinda was justified by self-defense. We conclude that there was no impropriety in the prosecutor's use of the terms "kill" or "killing" to describe what Adviento had done to Erlinda. The use of those terms was based on the evidence and accurately described what Adviento, by his own admission, had done. In the context of this case, the term "killing" was an appropriate synonym for the terms "force" and "deadly force." Accordingly, the prosecutor did not misstate the law by using the term "killing" in discussing Adviento's self-defense claim.

B.

Based on the foregoing analysis, we reject Adviento's alternative argument that his trial counsel provided ineffective assistance by failing to object to the prosecutor's remarks in closing argument.

26

IV.

Adviento argues that his trial counsel provided ineffective assistance by failing to adduce additional evidence to substantiate Adviento's claim of self-defense or to better establish Erlinda's motive for being the first aggressor. We disagree.

As Adviento acknowledges, evidence on both these points was presented at trial. Dr. Ho, the emergency room trauma surgeon who operated on Adviento, testified to the numerous serious injuries Adviento sustained, including three open stab wounds to his abdomen and three open wounds to the base of his neck, a collapsed right lung, six perforations of his intestines, and an injury to his spleen. Adviento testified regarding Erlinda's alleged motive for being the first aggressor, namely, that she was attempting to prevent him from exposing her lies to him, which would have been revealed through his checking her work records.

Adviento did not produce affidavits or sworn statements of witnesses to support his claim that additional favorable evidence was available. See Richie, 88 Hawaiʻi at 39, 960 P.2d at 1247 (concluding that an ineffective assistance of counsel claim based on the failure to obtain witnesses "must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses"). Adviento's uncorroborated assertions regarding the availability of possible favorable evidence or testimony of witnesses "amounts to nothing more than speculation and . . . is insufficient to meet his burden of proving" ineffective assistance of counsel. State v. Reed, 77 Hawaiʻi 72, 84, 881 P.2d 1218, 1230 (1994), overruled on other grounds by, State v. Balanza, 93 Hawaiʻi 279, 1 P.3d 281 (2000).[10]

---

[10] Because Adviento may not have had a fair opportunity to develop the record regarding this claim of ineffective assistance of counsel, we do not preclude him from raising this claim in an HRPP Rule 40 proceeding based on a more fully developed record.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED:   Honolulu, Hawai'i, July 10, 2012.

On the briefs:

Karen T. Nakasone
Deputy Public Defender
for Defendant-Appellant

Donn Fudo
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*
Chief Judge

*[signature]*
Associate Judge

*[signature]*
Associate Judge